**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Aaron Carl CARTER, Defendant-Appellant.**

**No. 71-1642.**

United States Court of Appeals, Ninth Circuit.

Feb. 7, 1972.

Hamlin, Circuit Judge, dissented and filed opinion.

Edward L. Cragen (argued), San Francisco, Cal., Thomas Salciccia, San Jose, Cal., for defendant-appellant.

James H. Daffer, Ass't U. S. Atty. (argued), San Francisco, Cal., for plaintiff-appellee.

Before HAMLIN and WRIGHT, Circuit Judges and CURTIS,* District Judge.

CURTIS, District Judge:

In a court trial, a jury having been waived, the appellant was convicted of possession of counterfeit Federal Reserve notes, with intent to defraud. (18 U.S.C. § 472.) He appeals his conviction urging in support thereof two contentions:

First, he states that since the finding and entry of a judgment of conviction was done in his absence and in the absence of his attorney, it violates the mandate of the Fifth and Sixth Amendments to the Constitution of the United States guaranteeing him effective assistance of counsel at all critical stages of the proceedings against him.

It appears from the record that at the close of the trial and after final arguments, the court took the matter under submission. A date was set approximately one month in the future for the pronouncement of sentence in the event the court should find the appellant guilty. This apparently was done to accommodate the appellant who was not then in custody and who lived at some distance. The court indicated that it would probably reach a decision within a week's time, which would give the probation office time to prepare a presentence report. At this point the following colloquy took place between the court and Mr. Salciccia, appellant's counsel:

> "THE COURT: . . . In the event I find the defendant guilty, you will appear for judgment and sentence one month from next Tuesday.
>
> "Of course, if I acquit the defendant, then you won't have to appear. I will notify you and you will have to tell Mr. Carter, if he is convicted, that he has to report to the probation officer.
>
> "MR. SALCICCIA: Yes, your Honor."

It seems clear that all parties acquiesced in this procedure and we see no impropriety in it, constitutional or otherwise, especially since the appellant has suffered no prejudice.

---

* Honorable Jesse W. Curtis, United States District Judge, Central District of California, sitting by designation.

In United States v. Smith, 411 F.2d 733 (6th Cir. 1969), relied upon by the appellant, the court held that where a defendant is being tried by a jury, both he and his attorney are entitled to be present at the time the verdict is received in order that the jury might be polled. However, in a case such as that before us where the appellant was tried by a court sitting without a jury, there is no such compelling necessity for the attendance of the defendant and his attorney.

■ Secondly, appellant contends that the evidence is insufficient to establish "a specific intent to defraud", an essential element of the offense. In order to deal with this contention, a brief review of the facts appears necessary.

In October 1969, the San Jose Police Narcotics Squad was informed by a female that one Willis Lewis Adams was in a position to furnish heroin and, also, counterfeit money. At the same time, the United States Secret Service agents became aware that new counterfeit bills were being circulated in the area. They therefore joined forces with the San Jose police and had the female informer set up a meeting with Adams for the purpose of purchasing heroin and, possibly, counterfeit money.

At the appointed time, the informer, wearing a Fargo transmitter, met with Adams under the surveillance of both San Jose police officers and Secret Service agents and, after some conversation, purchased from Adams a quantity of heroin. The appellant Carter accompanied Adams on this occasion and was present during at least part of the conversation. Immediately thereafter both Adams and Carter were arrested and in the search that followed, Carter was found to have in his possession two counterfeit bills, which he told officers he had won playing pool, without knowing that they were counterfeit.

Since the officers had no evidence that the appellant knew the bills were counterfeit or that he had any intention to pass them, it was decided to release appellant without prosecution. Adams, however, was prosecuted and ultimately convicted after two trials, the first of which resulted in a hung jury.

During the trials of Adams, a tape of the conversation between Adams and the female informer, taken by means of the Fargo transmitter, was offered in evidence by the prosecution. Appearing as a witness for the defense, the appellant Carter testified that he had attempted to inject himself into the conversation and that, at least in one instance, the voice on the tape was his and not Adams. Believing that this testimony showed appellant's knowledge of the counterfeit character of the bills before the arrest, the Government revived the charges against him and obtained a grand jury indictment upon which the appellant was tried and convicted, and it is his appeal therefrom which is now before us.

At appellant's trial officers, who had appellant Carter and Adams under surveillance at the time the tape was made, testified that although the appellant was in the vicinity, his voice was not on the tape. Notwithstanding this testimony, the Government attempted to prove that the appellant Carter, testifying as a witness in the Adams' trial, had admitted that his voice did appear on the tape, at least upon one occasion when he said: "Yeah, I had to come in and down a couple of them bad bills." A portion of the transcript of the tape and also a portion of the transcript of Carter's testimony in the Adams' trial pertaining to this statement was admitted and appears in the record before us. Furthermore, on cross-examination the appellant at his own trial admitted on the stand making such a statement at the time the Fargo tape was being made.[1]

---

1. Page 139, transcript line 3.
 "Q. And you said something to the effect that, 'I had to come in and down a couple of them bad bills'?

"A. I was talking about giving the bills back to her husband, right. I just used my own words in saying it.

The appellant further admitted knowing that the bills in his possession were counterfeit at least an hour or so before his arrest.

Upon this evidence, we think the trial judge might properly have found that the appellant had in his possession two counterfeit bills, that the bills were known by the appellant to be counterfeit, that he had known of the counterfeit character of the bills at least long enough before the meeting of Adams and the informer to form the intention to "come in and down a couple of them . . . ", that by referring to "a couple of them bad bills" the appellant had knowledge of more than the two bills, that the expression "to down a bill" meant, in the jargon of the street, to put a bill in circulation as genuine, and that consequently the appellant had the specific intent to defraud.

It is true that both at the Adams' trials and his own the appellant maintained that he did not know the bills were counterfeit when he received them; that when he did find out that they were counterfeit, he only attempted to find the person who had passed them to him; and that when he used the expression "down a couple of them bad bills", he merely meant he was attempting to find the person who gave them to him so that he could give them back and get his money.

After hearing all the evidence and being confronted with the witnesses, the court disbelieved the appellant's story, influenced no doubt by the appellant's evasive answers, his improbable explanations, and his inconsistent statements of which the record is replete. Although somewhat meager, we hold that the evidence is sufficient to sustain the court's finding of specific intent to defraud.

The judgment is, therefore, affirmed.

"Q. In fact, did you say, sir: 'I had to come in and down a couple of them bad bills'?
"A. That's what I said at the trial, yes.

HAMLIN, Circuit Judge (dissenting):

I respectfully dissent.

As the majority opinion states, a specific intent to defraud on the part of appellant must be established before appellant can be convicted of the crime charged. When the two counterfeit $10 bills were found on the appellant, he also had a "large wad" of genuine bills totaling $289.00 in his trousers pocket. The two bad bills were in the "large wad." He was then arrested and charged with possession of counterfeit money. These charges were dismissed, the government expert testifying "the United States Attorney who made a decision evidently thought there was not enough information."

Many months later, after appellant had testified for the defense in two state trials in which Louis Adams was charged with a narcotics offense, appellant was again charged with the present offense and brought to trial. The only additional evidence claimed against appellant was his testimony at these two trials.

In these trials appellant maintained that he had acquired the "large wad" of bills over a two or three day period playing pool, that he had discovered that the two bills were bad only an hour or so before his arrest, when he had been told by a pool player that one of the bills was counterfeit. He further said that he was told that a certain "Frisco Joe" had been passing bad bills; that he (appellant) had gone to Adams' house to inquire where he could find Frisco Joe so he could "down the bills," a slang expression meaning to exchange the bad bills with the person he got them from. According to his testimony, he then went with Adams to the vicinity of the pool hall, and was there told by Adams that

"Q. Did you or did you not say that on the evening of October 14th, 1969, in the vicinity of the Circus—
"A. Yes, I was telling her that I wanted her husband, he had given me some bad bills, yes."

the woman in the car was Frisco Joe's lady friend. After Adams had gone over to talk to this woman, appellant heard them talking about counterfeit money. Appellant walked over to the woman to tell her that her husband had given him some bad bills.

The Government offered no evidence that the appellant at any time had attempted to pass counterfeit money to anyone, to say nothing of the fact that it had offered no proof that he had attempted to pass counterfeit money with knowledge that it was counterfeit.

To convict the appellant, the evidence must be sufficient to establish beyond a reasonable doubt that appellant possessed the counterfeit bills with intent to defraud. To me, the record contains no such proof.

I would reverse the judgment.